Filed 2/27/26  Vartanian v. Swalef CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SONA VARTANIAN, | F087143 |
| Plaintiff and Appellant, | (Super. Ct. No. MCV083508) |
| v. | |
| BRANDON SWALEF, | OPINION |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Madera County.  Michael J. Jurkovich, Judge.

Law Office of Jeffrey Reich and Jeffrey Reich for Plaintiff and Appellant.

Lawvex, LLP and Catarina M. Benitez for Defendant and Respondent.

-ooOoo-

Sona Vartanian sued her neighbor, Brandon Swalef, for failing to cut back vegetation that was growing from Swalef's side of their common boundary over to Vartanian's side.  Ultimately, they resolved the dispute at mediation and signed a settlement agreement.  Under the settlement agreement, Swalef was required to have the property line between their properties professionally surveyed and staked and was also

required to remove any vegetation growing over the property line. Vartanian was obligated to dismiss her lawsuit upon his compliance. Vartanian, however, rejected Swalef's work and Swalef brought a motion to enforce the settlement agreement. The trial court granted Swalef's motion and dismissed Vartanian's lawsuit. Vartanian appealed. We affirm.

## FACTS AND PROCEDURAL HISTORY

*Introduction*

This matter arose from a dispute between Vartanian and Swalef, who own neighboring property parcels on the west side of Highway 41 (frontage road), south of Avenue 12, in Madera County. Swalef purchased his property in December 2003 and Vartanian acquired hers in April 2017. Swalef's property is situated south of Vartanian's. Swalef's property is two-thirds of an acre in area and has a 3000-square-foot structure on it; it is leased to a used-car dealership. Vartanian's property is an empty lot, approximately three-quarters of an acre in area.

Vartanian's property is fenced on some sides with a cyclone or chain link fence. The property line between her property and Swalef's is partially fenced: there are short fences on the eastern and western ends of the property line, but the middle portion is unfenced. The area along Highway 41 where the properties are located is zoned for both commercial and residential use.

Upon acquiring her property, Vartanian was concerned that vegetation (mainly, a row of bottlebrush bushes) growing along the boundary of the two parcels was encroaching onto her land. Vartanian was concerned about the encroachments because she wanted to fully fence her southern property line. She contacted Swalef to have him remove any encroachments on her land.

2.

*Litigation and Mediation*

The instant dispute arose from this situation, with Vartanian eventually filing, on April 24, 2020, the underlying lawsuit in Madera County Superior Court. Vartanian's complaint asserted causes of action for willful trespass, negligent trespass, and private nuisance.

On August 17, 2020, the parties, both represented by counsel,[1] attended mediation and reached a settlement. The settlement was memorialized in a written settlement agreement of the same date. Under the settlement agreement, Swalef was required to "pay for Jones & Snyder & Associates to survey and to stake the property line between" the Swalef and Vartanian properties. Swalef was also required to "remove[], at his sole expense, all of the encroaching debris to the written satisfaction of Sona Vartanian … on or before October 17, 2020." (Some capitalization omitted.) Finally, Swalef was required to "give written notice to [Vartanian's] attorney that the work was completed."

As for Vartanian, the settlement agreement provided: "[Vartanian] shall have 10 days after receipt of notice by [her] attorney to accept or reject the removal by [Swalef] of all encroaching debris. If [she] does not do so, then [she] will be conclusively presumed to have approved the removal of the encroaching debris." (Emphasis omitted.) The settlement agreement further provided: "Upon successful completion of the removal of the vegetation and debris, [Vartanian] will prepare and execute a dismissal with prejudice and will file the same with the Madera County Superior Court."

The agreement provided a full and final mutual release of all claims, including a Civil Code section 1542 proviso. Finally, the agreement confirmed its enforceability under Code of Civil Procedure section 664.6.

---

[1]  Vartanian's counsel was also her employer. Vartanian was apprenticing with him in order to take the California bar examination.

*Motion to Enforce Settlement Agreement*

On August 26, 2021, Swalef filed a motion to enforce the settlement agreement pursuant to Code of Civil Procedure section 664.6, which placed the matter once again before the trial court. Swalef filed a declaration in support of his motion, in which he declared, in part: "Pursuant to the pertinent parts of the Settlement Agreement, I was required to pay Jones Snyder & Associates ('JSA') to have the property line subject to dispute surveyed, staked, and established. The use of JSA was based upon [Vartanian's] choosing and requirement to do so. Based upon the survey results, I was required to remove some protruding brush along the property line. *I had all debris removed in a timely manner*." (Italics added.)

In his motion to enforce settlement agreement, Swalef stated that after he complied with his obligations to survey and stake the property line and clear vegetation away from it, Vartanian acknowledged his efforts but nonetheless rejected the work on grounds the underlying survey was "faulty." Swalef pointed out that Vartanian was required to dismiss her lawsuit because he had fully performed under the settlement agreement. Accordingly, he sought court intervention to enforce the terms of the settlement agreement.

The court set Swalef's motion for an evidentiary hearing. Prior to the evidentiary hearing, Vartanian filed a trial brief on September 13, 2021. Although Vartanian had previously rejected Swalef's performance under the settlement agreement (that is, establishing the property line and pruning back of encroaching vegetation) on grounds it was based on a "faulty" survey, in her trial brief she presented a new theory for rejecting Swalef's performance. In her trial brief, Vartanian stated: "[Vartanian] filed suit. [Swalef] continued delaying any cleanup until mediation. Then, [Swalef] failed and refused to do a complete and proper remediation within the time allowed. He did clean

4.

[the vegetation] back, but not enough for [Vartanian] to install her fence.  So, [Vartanian] has proceeded with this lawsuit [rather than dismissing it]."

The evidentiary hearing on Swalef's motion to enforce settlement took place sporadically over several days, spanning an extensive period:  the first day of testimony was January 24, 2022, and the final day of testimony was May 8, 2023.  Following the evidentiary hearing, the trial court issued a detailed written ruling.  In its ruling, the trial court preliminarily commented, "for a three page settlement agreement, this motion consumed a substantial amount of time."

The trial court ruled in favor of Swalef, noting that he had "demonstrated by (more than) a preponderance of the evidence that he [h]as satisfied his obligations under the Settlement Agreement."  The court observed:  "[T]he Settlement Agreement provides[,] 'Upon successful completion of the removal of the vegetation and debris, [Vartanian] will prepare and execute a dismissal with prejudice and will file the same with the Madera County Superior Court.'"  The court concluded:  "The court having found [Swalef] to have performed under the Settlement Agreement, Defendant's motion [to enforce settlement] is granted, and Plaintiff's Complaint is dismissed with prejudice."

Vartanian challenges the trial court's posthearing ruling on Swalef's motion to enforce settlement agreement.  Accordingly, we begin by summarizing the evidence presented at the underlying evidentiary hearing on the motion.

*The Evidentiary Hearing on Swalef's Motion to Enforce Settlement Agreement*

The primary witnesses who testified at the evidentiary hearing held by the court on Swalef's motion to enforce the settlement agreement were:  Swalef; Nicholas Vanlandingham (owner of Jones Snyder & Associates, a surveying firm); Benjamin Zuniga (Swalef's groundskeeper or gardener); and Vartanian.  We have summarized their respective testimony below.

5.

*Testimony of Brandon Swalef*

Swalef testified he purchased his lot on Highway 41 in 2003 and Vartanian acquired hers in 2017. After Vartanian acquired her lot, she contacted Swalef. Swalef testified about the interaction: "It's been some years so I don't recall all the details, but the most important element of the phone call was to demand that I remove my landscaping so she could put in a fence." Swalef continued: "At the time … [t]he only landscaping that I was aware of that would need to be removed in order to put in that fence would be a row of bottle brush that needed to be trimmed back from the property line." Swalef added: "Well, after the phone call, I realized it wasn't just the bottle brush. There was … a planter that was made of railroad ties that extended 18 inches over the property line. That is what I removed [within a few days of the conversation with Vartanian]." The conversation and related planter removal occurred in 2018. Swalef testified he had the planter cut back approximately 18 inches.

Soon thereafter, Vartanian sent Swalef a letter signed by an attorney seeking removal of encroachments on her land; Swalef also retained counsel. Their attorneys exchanged letters about the encroachments and Swalef's removal efforts. (Exhibits 4, 5, 6.) On November 16, 2018, Vartanian's counsel sent a letter to Swalef's counsel, stating, in part: "My client cannot complete the fencing [of her property] in a professional manner until your client removes [all] obstructions. [¶] If this matter is not resolved promptly, then my client will go to court for resolution …. [¶] Please get in touch with me by the 3rd of December to let me know what your client's intentions are." Swalef testified his attorney did not share this letter with him until after a process server served him with the instant complaint in 2020. Swalef said, had he been timely made aware of the November 16, 2018 letter, he would have taken prompt action to allay Vartanian's concerns.

Swalef acknowledged that during the period in question, there was a 50-foot long "row of bottle brush" along the boundary between his lot and Vartanian's lot. In addition, branches of trees along the boundary extended approximately 18 inches over the property line and onto Vartanian's lot. Swalef did not immediately cut the bottlebrush back as Madera County Code Enforcement had indicated he was not required to do so.

In 2020, Vartanian filed the instant lawsuit. The parties went to mediation on August 17, 2020, and settled the matter; they memorialized their settlement in a written settlement agreement. (Exhibit 22.) Swalef described his understanding of the settlement agreement: "The agreement required me to pay at my own expense to have Jones & Snyder *survey and stake* the property line between our two properties. After the line was established[,] I was required to cut back any landscaping that encroached upon Ms. Vartanian's property … and I was required to do all of those things by October 17th [2020]." (Italics added.) He added: "As part of the [settlement] it was a requirement of me to cut everything, all the landscaping from my side of the property line away from the property line so that nothing from the ground to the sky was crossing the property line."

On August 24, 2020, Swalef called Jones Snyder & Associates to have them survey and stake the property line, as required in the settlement agreement. Once the property line was demarcated, Swalef cut back the vegetation on his property to his side of the property line. Swalef was asked: "How did you know how far back the landscaping had to be cut?" Swalef responded: "*Well, I wasn't given an exact measurement*, but as per the settlement agreement I was only required to remove the *encroaching* debris. My understanding of that is anything over the property line, *but I was not given a specific requirement of distance*." (Italics added.) Swalef was also asked: "After that work was conducted, did you ever receive a request for dismissal from Ms. Vartanian and her attorney?" Swalef answered: "I did not."

Upon informing Vartanian's counsel that the survey and staking were completed and the vegetation cut back, Swalef's counsel received a responsive letter from Vartanian's counsel. (Exhibit T.) The responsive letter stated:

> "I observed the work that had been done myself. It appeared your client did work removing debris from my client's property. However, his work was apparently done based on a faulty survey. [¶] *My client's property, as recorded is rectangular.* The width should be just over 100 feet [at all points] front to back. The front marker [placed by Jones Snyder & Associates] seems properly positioned. At the front, my client's property measures 100 feet across. We had measurements taken of the width of the property based on the survey. Back one-fourth of the way, the survey starts to short my client, as much as five feet, continuing to the back. [¶] If, as we maintain, the survey is faulty, then substantial debris still needs to be removed, after the survey is properly reconfigured. [¶] Please feel free to call me, so we may discuss this further, get the settlement completed, so our clients can go their separate ways and my client has the fence installed. (Italics added.)

Swalef did not receive any surveys from Vartanian negating the survey prepared by Jones Snyder & Associates.

Swalef was again asked about his understanding of the scope of his obligation as to pruning back vegetation, under the settlement agreement. Swalef responded: "[T]he work that needed to be done required for me to remove any encroaching debris from the ground to the sky, as long as — my understanding was as long as nothing went over the property line, at any point, from the ground to infinity, it should be acceptable." Swalef reaffirmed that he believed he had complied with the requirements of the settlement agreement.

In the context of the survey and staking conducted by Jones Snyder & Associates in September 2020, Swalef testified that Vartanian's property "is not a perfect rectangle" and that "[i]t's more of a parallelogram." Swalef indicated he saw the stakes Jones Snyder & Associates placed along the property line as part of their surveying work.

Although he stated he could not "give an exact number" as to the number of stakes he had seen, when pressed, he responded, "[p]robably around eight."

Vartanian's counsel questioned Swalef regarding a potential agreement he had with Vartanian, from the mediation, that he would have the property line staked at 20-foot intervals. Swalef testified: "We never reached an understanding regarding the stakes or how far they should be placed apart." Vartanian's counsel asked him to "[s]ay that again." Swalef repeated: "We never had an understanding or a discussion as to how many stakes should be put in place or their distance from each other." Nor did Swalef have a personal view on the issue; he testified, "it's not my place to tell a land surveyor how to do their job."

After Swalef had the property line surveyed and staked, he asked his groundskeeper/gardener to "cut the landscaping back to [his] side of the property line" and to remove any branches or foliage that overhung Vartanian's property. Swalef testified: "I told him that I was [required] to remove all of the vegetation extending over the property line from the ground to infinity."

Swalef discussed photographs of the property line taken immediately *after* the survey and staking were completed and the bottle brushes had been pruned back. (Exhibits C, O.)[2] He also discussed photographs of the property line taken shortly thereafter, in December 2020 or January 2021. (Exhibits D, G.)[3] The photographs showed stakes defining the property line between the two properties, with the vegetation along the property line cut back to Swalef's side of the property line. Another photograph showed a stretch of chain link fence along the front or east side of Vartanian's property; the fence extended south of the property line (as marked by a wooden stake) and encroached onto Swalef's property. (Exhibit M.) Swalef testified that

[2]     Exhibit O is attached as Appendix A, *post.*

[3]     Exhibit G is attached as Appendix B, *post.*

9.

the fence encroached 0.4 feet over the property line and then turned and ran westwards for 20 to 25 feet on his property. Vartanian had installed the encroaching fence in the spring of 2021. The photographs were all admitted into evidence.

Vartanian's counsel had an exchange with Swalef as to one of the photographs, Exhibit G. (See Appendix B, *post.*) Counsel asked : "Now, looking at this photograph, is it fair to say this is further back into your properties? It's closer to the western end of the properties than the eastern end; is that a fair approximation?" Swalef responded: "Yes, it is." Counsel continued: "And it's looking east towards [Highway] 41, isn't it?" Swalef answered in the affirmative. Counsel added: "Now, from this vantage point of this stake [in the foreground], the front stake, you can't see the stake that's at the eastern end of the property, can you? You can't see it." Swalef replied: "No, I can't see the stake because it's being obscured by the fence [running east to west] that was put in place by Ms. Vartanian encroaching on my property." Counsel countered: "What about your bushes encroaching in the view? Would that have anything to do with not being able to see that spot?" Swalef answered: "From my perspective, no, it's the fence."

*Testimony of Nicholas Vanlandingham*

Nicholas Vanlandingham had been the owner of Jones Snyder & Associates, "a land surveying business," since 2015; prior to that he was an employee at the firm since 2006. He currently serves as a licensed senior land surveyor there. His duties entail "performing surveys and reviewing surveys performed by [his] staff." The surveying business involves establishing parcel boundaries "on the ground and depicted on maps." Vanlandingham was admitted by stipulation as an expert in "identifying the boundaries of lots."

In September 2020, Vanlandingham's staff performed a field survey of Swalef's property and prepared a map showing the survey results, as commissioned by Swalef. Vanlandingham reviewed the work. They started with the original subdivision map from

10.

"approximately 1960" showing Swalef's parcel, and retraced the boundaries of the parcel on the ground by finding the "original corners" as depicted on the map. Having done so, they prepared a "map that … shows the results of that survey and the property line in question." Vanlandingham approved and stamped the new survey map. (Exhibit A.)[4] The survey map is consistent with the lot boundaries on the original subdivision map.

Vanlandingham noted that the 2020 survey map prepared by his firm, depicts partial chain link or cyclone fences along the eastern and western ends of the boundary between the Swalef and Vartanian properties; the boundary is unfenced in the middle. (See Appendix C, *post.*) The fence along the western end of the boundary encroached on Swalef's land "by approximately 2/10 of a foot" (0.2 feet). In addition, the survey map shows a fence running along the front or east side of Vartanian's property, with its corner encroaching on Swalef's property. Vanlandingham testified: "[S]o the *corner* of [this] fence is located 4/10 of a foot [i.e., 0.4 feet] south of the property line." (Italics added.) This fence moreover extended westwards from the corner and continued to encroach on Swalef's property along this stretch. In sum, the existing partial fences along the property line between the Swalef and Vartanian properties are situated south of the property line and encroach on Swalef's property, as does the corner of the fence running along the front or east side of Vartanian's property.

Vanlandingham explained that on the original subdivision map for the area, lot 68 is Vartanian's lot and lot 67 is Swalef's lot. Vanlandingham testified: "The shape of [Vartanian's] lot … may not be a perfect rectangle." He added: "The shape of the lot is controlled by the definition of the lot, as described and depicted on the original subdivision map, which is a common boundary line between lot 68 and 67. Furthermore,

---

[4] Exhibit A is attached as Appendix C, *post.*

11.

the location and definition of that boundary line is controlled on the ground by the property corners, which we have found those original corners."

In further addressing whether the lots at issue were perfect rectangles, Vanlandingham turned to maps associated with a prior survey Vartanian had commissioned of her property, from Jones Snyder & Associates in September 2017. (Exhibits 2.2, 2.4.) With respect to one of the 2017 survey maps of Vartanian's property, Vanlandingham testified: "This corner record map depicts the dimensions that we measured for Ms. Vartanian's lot, and those dimensions are between monuments in the ground. You can see that the dimensions on the north and south lines are not exactly the same. Similarly, the dimensions on the east and west lines are not exactly the same. So I believe … it is not a perfect rectangle."

Vanlandingham explained that any claim that Vartanian's property consistently measured 100 feet across would only be "an approximate statement." He added: "However, the precise dimensions are shown on this corner record." (Exhibit 2.4.) Vanlandingham also pointed out that the measurements on the 2017 survey maps varied to some extent from the original 1959 or 1960 subdivision map. He noted that some measurements were "half of a foot longer" in the 2017 survey maps, "meaning that everybody gets a little bit more land." He explained the discrepancies were to be expected given that measuring capabilities are presently far more advanced than they were in 1959.

After Vanlandingham's staff completed the field survey, Vanlandingham stopped by Swalef's property to check their work; he conducted site visits as a "quality control" measure. Vanlandingham testified he had no reason to believe Jones Snyder & Associates' 2020 survey and survey map of the property line separating the Swalef and Vartanian properties was faulty or inconsistent with the original subdivision map.

Vartanian's counsel questioned Vanlandingham about administrative aspects of his interaction with Swalef. Vanlandingham testified his office provided Swalef written estimates for the surveying work he had requested. Vanlandingham was shown an e-mail with estimates sent by Jones Snyder & Associates to Swalef. (Exhibit 32.) The e-mail provided two alternative estimates. One estimate, for $1200, encompassed three tasks: "[1] Find, Flag, and Verify or Reset all property corners[;] [2] Set intermediate points on property lines where accessible[;] [3] Provide a Map of Survey showing all corners/line points, house, and property lines superimposed on a color aerial photo." The other estimate, provided: "Our fee to Stake the North Line ONLY is: $800." Vanlandingham stated, with reference to the estimates: "This looks like a boilerplate scope of work. I likely only provided the dollar amounts listed." He further clarified, with respect to the second estimate, that "the intent is clear that the north line would be staked and the fee would be $800."

Next, Vartanian's counsel questioned Vanlandingham regarding the invoice for the work performed at the Swalef property. (Exhibit 31.) Vanlandingham testified that the invoice was "stamped 'paid,' 10/26/2020." The invoice listed a charge of $800 and described the services rendered: "Find, Flag, & Verify Property Corners and Provide Map of Survey as per Proposal." Under questioning, Vanlandingham acknowledged that the invoice did not specify the staking of the north line of Swalef's property. Vanlandingham further explained: "I think the invoice is not intended to be a comprehensive report of what we did. It's an invoice. The documents that accompanied the invoice were the report, [which included a survey map depicting the] results of the survey." Vanlandingham was also asked: "[W]hen you checked the property after your employees had completed their work, did you notice if any stakes had been placed?" Vanlandingham answered: "Yes."

13.

Vanlandingham further noted that he saw "[m]ore than four stakes" that were "consistent with what our company uses." When Vanlandingham was subsequently questioned with reference to the survey map his company had prepared, he said it showed the property line was marked by four intermediate stakes and two end point stakes, for a total of six stakes. (See Appendix C, *post*.) Vanlandingham added that his company's practice is to attach red, yellow, and/or pink ribbons to its stakes. He clarified: "Typically, the [use of] red and yellow colors marks the property corner; the two colors used together at the end point of a line." In other areas, ribbons of just one color may be used.

### Testimony of Benjamin Zuniga

Benjamin Zuniga testified at the evidentiary hearing. He noted: "I do the maintenance of [Swalef's] house, his yard, and I work with him. I helped him work on the [Highway 41] property, the one that I believe is part of this problem."

Zuniga undertook a special project for Swalef in September 2020, involving cutting back and removing branches "that went over to [Vartanian's] property." Zuniga followed a "marked … line" in doing this work. Swalef told Zuniga "to just clean from where the line was, and to make sure that none of it extended to the other side." Swalef wanted to make sure that "[e]verything that is not his property [was] clean." Zuniga noted: "[So,] [b]asically, every branch along that whole line that extended to the property of that lady, those are the ones that I cut."

Zuniga, along with two helpers, did an initial clean up on September 21 (full day) and 22 (partial day), 2020. Zuniga and a helper returned on September 26, 2020 (partial day) to do more work, because Swalef asked Zuniga to cut the vegetation further back than was initially done. On September 26, they "cut more of the branches" and "made more space," so "there wouldn't be anymore problems with the branches extending over to the other property." Zuniga added: "[W]hat I did … is to look at the line from all of

14.

the angles to make sure that I created enough space from all of the angles," so "[Swalef] wouldn't have anymore problems." He also said: "When I was doing the work, the whole time I was taking pictures and sending them to [Swalef], so he could tell me if -- just to check with him if I was doing it right, or [so] he could tell me if I need to cut more."

Zuniga was shown Exhibit O, a photograph depicting a segment of the property line, with two stakes connected by string. (See Appendix A, *post.*) Zuniga recognized the scene in the photograph, agreeing it accurately reflected what the property line area looked like after he cleaned it up. Asked how he had known where to cutback the brush, he stated with reference to Exhibit O: "Well, when you look at the line, you can see which [branches] are spreading over, and you base yourself on that and you go from there." Zuniga was referring to the property line as marked by stakes connected by string.

### Testimony of Sona Vartanian

Sona Vartanian acquired her property on April 26, 2017. Vartanian had Jones Snyder & Associates survey her property in 2017-2018. Vartanian insisted this survey was completed in 2018, but the survey maps prepared by Jones Snyder & Associates indicated the work was done in 2017. Vartanian also addressed the survey map prepared by Jones Snyder & Associates in September 2020 for Swalef. (See Appendix C, *post.*) She testified that she checked Swalef's property after the fieldwork for the 2020 survey was completed and saw four stakes placed on the property line by Jones Snyder & Associates' staff. All four stakes had red and yellow ribbons attached. Shortly thereafter, in the first week of October, additional stakes materialized on the property line; the new stakes had pink ribbons attached. The new stakes were placed "[a]round the encroachment[s]" spilling onto her property.

Vartanian called a fence installer, Isaac Vizeros of A-1 National Fencing, to her property on October 2 and 7, 2020.[5]  Vartanian and Vizeros measured the north-south width of her property from the new stakes placed on the property line, with results varying between 95 to 100 feet.  Vartanian testified that for her, this "created a confusion" "[a]bout the boundary line."

Vartanian's counsel asked about her understanding of what the parties' settlement agreement required in terms of any property line survey.  (Exhibit 22.)  Vartanian responded:  "Settlement agreement, I'm referring to [paragraph] [n]umber 1.  It says it is agreed that Brandon Swalef, the Defendant, shall pay for Jones & Snyder Associates to survey and to stake the property line between them."[6]  Vartanian testified she *rejected* Swalef's compliance under the settlement agreement, in terms of surveying and staking the property line and pruning back encroaching vegetation.  Asked to specify her grounds for rejection, Vartanian stated:  "Based on the settlement agreement [paragraph] [n]umber 1, the surveyor should have surveyed the property line -- which was not done -- and stake[d] the property line *every 20 feet* -- [¶] … [¶] … on a 333 feet long property line, [that] is approximately 16 … survey stakes."  (Italics added.)

Vartanian's counsel then asked:  "You indicated that the property wasn't staked properly in your mind's eye.  Was there anything else that led you to conclude that you were going to reject [Swalef's] performance?"  Vartanian answered, "Yes," and her counsel followed up to ask, "What?"  Vartanian stated:  "I received … the letter from

---

[5]     Vartanian testified that Vizeros had previously consulted with a prior tenant of hers, James Tuck, who had leased her property and wanted to fence it.  Tuck had rented Vartanian's lot starting on August 1, 2019, for storing his RVs.  Tuck, however, ended his lease citing thefts from his RVs.

[6]     Later in her testimony, Vartanian's counsel again questioned her about the written settlement agreement:  "What did you consider the *entire* settlement agreement to be, Ms. Vartanian, regarding the staking?"  (Italics added.)  Vartanian confirmed the written agreement simply called for the "[t]he property line … to be surveyed and staked."

defendant[']s attorney … attaching the survey invoice as well as [the] survey map and also the … supposedly live picture of the property after it was staked. [¶] So I took the map and I took the picture -- which is actually … Exhibit O … I took both and I went on the property. I located the first … stake … [¶] Then I located the second stake, and I was walking straight line. I couldn't walk straight because the bottlebrush bushes covered the property line and all over both sides of the property [line]. It was a really thick vegetation. [¶] So then I found the extra [stakes], which [were] not on the map, and that made me walk [in a] curve like a parabola around the encroachments to locate the third surveyor's stake. [¶] And from there, I turn around and I couldn't see the front markers, the first two that they … put in." (See Appendix A, *post.*) Vartanian also complained that a stake visible in the foreground of Exhibit O had pink ribbons that did not "match the red and yellow color which the surveyor tied to their stakes."

The trial court admonished Vartanian's counsel: "One of the big issues in this case, we all know is: What is the Court going to  -- how is the Court going to determine where the property line is? [¶] … [¶] There have been references to survey stakes. Your client is opining as [to] factual things she hasn't established a foundation for, such as: The [ribbon] colors don't match the red and yellow color which the surveyor tied on the stakes. Well, okay, I don't know where that came from [¶] … [¶] … your client's got a lot to say; not all of it admissible. It's hard to break it out through a long paragraph." The court then struck Vartanian's answer and asked her counsel to ask narrow questions designed to elicit admissible evidence.

Vartanian's counsel continued to question her in the same way as before. Vartanian reiterated that Exhibit O was problematic. She stated: "So introducing that picture, Exhibit O, which [was] taken [on] September 28[, 2020] based on defendant record, and mapping with the map of the survey, these two did not match, which made the survey look faulty." She also repeated: "[B]esides surveying, [the property line] had

17.

to be staked based on our settlement agreement understanding … every 20 feet. [¶] But that was not done, and obviously, I could tell why because of that heavy encroachments that is about 120 feet long. Bottlebrush bushes, it covered the entire property line and was all over both sides of the property line."

The trial court interjected: "I'm not going to listen to anything that has no foundation. I'm not 12 people. I'm one person. Half of what she says, it's absolute [Evidence Code] 801-opinion testimony with no foundation. I'm not going to consider that at all." The trial court noted: "We all know what the issues are in this case. I understand what her frustrations are. She's not competent to determine how many stakes there should be. There's no evidence that it's supposed to be every 20 feet in the settlement agreement." The trial court added that rather than eliciting "inadmissible opinion [testimony] under [Evidence Code section] 801," counsel could rework his questions to elicit percipient testimony from his client.

Vartanian's counsel then asked Vartanian what "convinced" her that "there were substantial encroachments for a substantial portion of that boundary," even after September 2020. Vartanian responded: "The groundwork, the trunks of the bushes, still were there. The -- spread out of the bushes around. There were [a] few branches [that] were cut. But in this case, branches wouldn't do it; it had to be groundwork as well in order to see the property line so the fencing contractor [could] put [in] the fence." Vartanian added that post-September 2020, the bottlebrush encroachments continued to encroach along 120 feet of the property line, and the railroad-tie planter also remained as an additional encroachment, untouched and in its original location. At the same time, Vartanian confirmed she had approved the October 8, 2020 letter that her counsel sent to Swalef, rejecting his performance under the settlement agreement; the letter had merely stated that Vartanian was rejecting Swalef's performance because of a "faulty" survey.

18.

Vartanian testified that in January 2021, she contacted a surveyor, Dale Mell, to survey and stake the property line for her. She signed a retainer agreement with Mell in April 2021 and that same month he came out to survey the property line. While Vartanian insisted Mell conducted the survey in April 2021, the survey map prepared by Mell, dated January 28, 2021, specifically noted the date of survey was January 14, 2021. (Exhibit 16.3.) Vartanian asked Mell to stake the property line "every 20 feet" and "to use a blue-color ribbon instead of a pink-color ribbon." Mell performed the survey and staking (his stakes had light blue ribbons attached). According to Vartanian, Mell was not able to stake the property every 20 feet because of bottlebrush bushes encroaching over the property line. The court asked Vartanian's counsel whether Mell was on Vartanian's witness list; counsel responded in the negative.

In addition to the survey conducted by Dale Mell in 2021, Vartanian commissioned an additional survey in 2022, by Bedrock Engineering. (Exhibit 20.2.) Vartanian acknowledged she could not present any survey to the court that would contradict the September 2020 survey Jones Snyder & Associates had performed for Swalef. Swalef's attorney asked her whether there were any "professional engineers [or surveyors] that provided reports to indicate that [Jones Snyder & Associates'] survey line was faulty[?]" Vartanian responded: "My observation is good enough. I've been teaching mathematics for, what, over 22-plus years. I know what a straight line is. I know what the property is. I know what the corners are. I'm good enough without

19.

anybody else."  Vartanian did not call either of the surveyors she had utilized, to testify in an expert capacity.[7]

Vartanian said her own observations supported her view that the boundaries of her lot represented straight lines.  She conceded she could not back up her assertion with expert testimony from a survey engineer.

*The Settlement Agreement Signed by the Parties at Mediation*

The settlement agreement adopted by the parties at the August 17, 2020 mediation, provided, in relevant part:

> "The parties to SONA VARTANIAN vs. BRANDON SWALEF, et al., arising out of Case No. MCV 083508 concerning the real property located on the frontage road to Highway 41 in Madera County, South of Avenue 12, have reached a full and final settlement of all claims in said matter as follows:

> "1.     It is agreed that BRANDON SWALEF (hereinafter Defendant) *shall pay for Jones & Snyder & Associates to survey and to stake the property line between them.*  This shall be done on or before September 17, 2020.

> "2.     Defendant *removes*, at his sole expense, all of the *encroaching debris* to the written satisfaction of SONA VARTANIAN

---

[7]     Although Michael Scott Hartley of Bedrock Engineering, who conducted one of the surveys for Vartanian in 2022, testified briefly on behalf of Vartanian, he did not do so as a surveying expert.  Hartley was offered as an expert "for the purposes of opining based on his training, knowledge, and experience as to what the property looked like [in September 2020,] over a year before he was engaged to [survey it]."  However, the trial court excluded Hartley as an expert for this purpose.  Hartley testified merely as a percipient or lay witness.

When Hartley wrapped up his testimony, the trial court commented:  "What nobody has talked to me about is whether [Vartanian] … disagrees with Jones Snyder's survey.  It's different from [the issue of] whether the encroachments were cut back, but if [Vartanian] agrees with Jones Snyder's survey, all right, then the landscape is different for me[.]"  Vartanian's counsel responded:  "Well, I do want to ask [Hartley about that] another time."  However, Vartanian's counsel never recalled Hartley to the witness stand and never asked him about the accuracy of Swalef's survey.

20.

(hereinafter Plaintiff), on or before October 17, 2020.  Defendant shall give written notice to Plaintiff's attorney that the work was completed.  Plaintiff shall have 10 days after receipt of notice by Plaintiff's attorney to accept or reject the removal by Defendant of all encroaching debris.  If Plaintiff does not do so, then Plaintiff will be conclusively presumed to have approved the removal of the encroaching debris. [(Boldface omitted.)]  [¶] … [¶]

"5.     Plaintiff will be constructing a fence between the Plaintiff and Defendant's property.  [¶] … [¶]

"6.     Within 10 days of written request by Plaintiff's contractor, Defendant will either approve or reject in writing, the line proposed by the contractor for Plaintiff's fence.  If Defendant does not do so, then Defendant will be conclusively presumed to have approved the line designated by the Contractor.

"7.     *Upon successful completion of the removal of the vegetation and debris, Plaintiff will prepare and execute a dismissal with prejudice and will file the same with the Madera County Superior Court*.  [¶] … [¶]

"9.     … this is a full and final Release … of all claims[.]

"10.    Each party shall pay their own attorney fees and costs.  The mediator's fee is to be shared equally by the parties.

"11.    The parties intend this settlement agreement, arrived at through mediation, to be binding and to be enforceable under California Code of Civil Procedure [section] 664.6[.] …

"12.    Each attorney signing this agreement on behalf of a party it is to be treated [sic] as if drafted jointly by the parties and not the mediator and that he/she is duly authorized to execute it on behalf of the client. [¶] … [¶]

"14.    *This agreement contains the entire agreement between the parties hereto and the term of [t]his settlement and release are contractual. The terms of this agreement may not be enlarged, diminished or modified in any degree, except by a writing specifically referring to this agreement and signed by the party against whom the modification is sought to be enforced*."  (Italics added.)

*Trial Court's Order-After-Hearing Granting Swalef's Motion to Enforce Settlement*

Following the evidentiary hearing on Swalef's motion to enforce settlement and after submission of posthearing briefs by the parties, the trial court issued a 27-page detailed and well-reasoned "ORDER AFTER HEARING GRANTING DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT UNDER CCP SECTION 664.6." (Boldface omitted.) We will summarize the trial court's order, which was well crafted and well supported.

*Trial Court's Order: Preliminary Overview*

The trial court's order preliminarily set forth a procedural overview of the matter: "On August 26, 2021, Defendant [Swalef] filed an ex parte application for an order shortening time to hear his motion to enforce the settlement agreement. That motion was opposed by Plaintiff [Vartanian], who also filed a motion to change venue to Fresno County. After a series of hearings and the motions being fully briefed and argued, the court denied the motion to change venue and set the matter for hearing on Defendant's CCP § 664.6 motion."

The trial court continued: "The first day of testimony was January 24, 2022, and the last day of testimony was May 8, 2023. The court notes it ordered sixteen separate transcripts of testimony, though in some cases because different reporters were used in the afternoon than the morning the actual number of days are a bit less than 16, but not by much. In other words, for a three page settlement agreement, this motion consumed a substantial amount of time."

The trial court addressed Code of Civil Procedure section 664.6, pursuant to which Swalef brought his motion to enforce settlement. The court stated: "In relevant part, Code of Civil Procedure section 664.6 states: [¶] …[¶] (a) If parties to pending litigation stipulate, in a writing signed by the parties outside of the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may

22.

enter judgment pursuant to the terms of the settlement.  If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."  The court noted that "Paragraph 11 of the Settlement Agreement … provides the Settlement Agreement is enforceable under Code of [Civil] Procedure section 664.6."

The trial court next outlined the contours of the underlying dispute:  "Plaintiff and Defendant are the owners of commercial properties along the frontage road to State Route 41, south of Avenue 12 in Madera County.  These properties abut each other.  Plaintiff contends Defendant's foliage (in particular his bottlebrush bushes) encroached over the property line and onto her property such that she could not install a fence along the contiguous property line."  The court continued:  "At the mediation, at which both Plaintiff and Defendant were represented by counsel, the parties signed a Settlement Agreement which, by its terms was stated to be 'a full and final settlement of all claims….'"

The trial court added:  "At issue between Plaintiff and Defendant is whether Defendant (moving party) performed under the Settlement Agreement.  Defendant contends he performed.  Plaintiff contends Defendant did not properly perform under the agreement and that Defendant's performance was properly rejected under the terms of the Settlement Agreement."  The court noted that the dispute was centered on paragraphs 1 and 2 of the Settlement Agreement, which, respectively, required (1) Swalef to have Jones Snyder & Associates survey and stake the property line, and (2) Swalef to remove encroaching debris to the written satisfaction of Vartanian.

*Trial Court's Credibility Findings*

The trial court next addressed credibility.  The court stated:  "As both counsel, know, the undersigned, as the trier of fact, sat through each day of testimony, and listened to each witness and party testify.  This means the undersigned observed voice tone, body

23.

language, facial expressions, and the general demeanor of each witness or party. The undersigned has also served as a bench officer for more than ten years and has heard a substantial number of witnesses and parties testify before the undersigned over the years. As the undersigned mentioned to both counsel over the many days of testimony in this case, credibility of a witness/party is always an issue, and wide breadth was given (often over objection by the adverse party) where the undersigned felt the question and its answer would assist the court in determining the credibility of a witness or party."

The trial court went on to make specific credibility findings. The court noted: "The court finds Defendant SWALEF to be generally credible. While there were some inconsistencies in his testimony, on balance, the court finds his testimony to be credible." The court further noted: "On the other hand, the court finds Plaintiff VARTANIAN to be lacking in credibility. While it is difficult to fully articulate all of the reasons for this finding, in summary, Ms. VARTANIAN did not care about the court protocol (lawyer asks a question and witness answers the same question). She repeatedly ignored her attorney's and the court's admonishments to answer the question (and only the question) presented. While this was a common problem even when being asked questions by her own attorney, when being asked questions by opposing counsel, she was at times just plain evasive."

The court continued: "Ms. VARTANIAN[] attempted to explain this behavior as a language issue. Ms. VARTANIAN wanted to correct an answer given in prior testimony by explaining, through her attorney, that the word 'property' as used in the question has a different meaning in Armenian and Arabic (which according to her attorney, are her 'native tongues')—the implication being she misunderstood the question. [Citation.]" The court added: "Given Plaintiff VARTANIAN's extensive education and degrees[,] the court finds it simply not credible that Plaintiff

24.

VARTANIAN misunderstood the English meaning of the word 'property.' Rather, it is more likely she simply wanted to change her answer."

The trial court included specific excerpts from the reporter's transcript of the proceedings, to support its conclusions. The court then continued: "There are many other examples, the above is simply illustrative. Ms. VARTANIAN also testified about 'false flags,' 'burglars,' people who 'trespassed' on her property and took an 'untrue photo,' with no evidentiary basis for such statements…. Should this case make it to the court of appeal, the undersigned recommends a complete review of the record, all questions asked of Ms. VARTANIAN (even those asked by her own counsel) and her answers. She was simply not credible – notwithstanding her counsel's efforts to rehabilitate her or explain her behavior."

*Trial Court's Analysis as to Paragraph 1 of the Settlement Agreement (Survey and Staking)*

The trial court analyzed the issues before it. The court stated: "Defendant was obligated under [paragraph 1 of the] Settlement Agreement … to pay 'Jones & Snyder & Associates' to 'survey and stake the property line between them.' Concerning the survey, that was the extent of the work to be done." "Ms. VARTANIAN, through her counsel, rejected the survey as 'faulty' for shorting her five feet of her property[.]" The trial court continued: "As to the faulty survey claim by Ms. VARTANIAN, Defendant called Mr. VanLandingham, a licensed surveyor from Jones Snyder, the surveying firm Defendant was obligated to retain under the Settlement Agreement. From the undersigned's perspective, Mr. VanLandingham was a credible witness who explained his firm surveyed the property line and staked it. Mr. VanLandingham has been a licensed land surveyor since 2007…. [Vartanian's counsel] stipulated Mr. VanLandingham was an expert, 'regarding the boundary lines of those two lots…. Mr. VanLandingham's staff prepared a map of survey in September 2020." The court included pertinent excerpts of Vanlaningham's testimony and related exhibits in its ruling.

25.

The trial court set forth its findings: "To the court, Defendant SWALEF, through Mr. VanLandingham, has by more than a preponderance of the evidence, established Jones & Snyder did survey the boundary and did stake the property line between the two properties (Defendant SWALEF's obligation under paragraph one of the Settlement Agreement). Mr. VanLandingham's testimony also rebutted Ms. VARTANIAN's claim the survey was 'faulty' because her property is a 'rectangle' and she was short[ed] 'as much as five feet[.]' … Mr. VanLandingham explained … the property is not rectangular, and rather than being 'short[ed],' 'everybody gets a little bit more land.'"

The trial court emphasized: "It is noteworthy to the court that notwithstanding Plaintiff VARTANIAN hiring two separate land surveyors (Mr. Dale Mell and Bedrock Engineering (Mr. Hartley)) after Mr. VanLandingham's company finished their work, she did not call either of them to point out any problem with Jones & Snyder's work. This even though [her counsel] suggested Mr. Hartley of Bedrock might be called back for that purpose. Also, for reasons known only to Plaintiff VARTANIAN[,] she possesses but did not include in her hearing exhibits a document that indicates a survey was done by Mr. Mell in April of 2021." (Fn. omitted.) The court added: "Understanding Plaintiff VARTANIAN appears to possess but not subpoena and produce for expert testimony two surveyors she retained to survey her property, a logical conclusion is their testimony concerning the Jones & Snyder survey would be less than helpful."[8]

The trial court noted it was mindful of a sentence in the rejection letter sent by Vartanian's counsel to Swalef after he had performed under the settlement agreement. The sentence in question stated: "If, as we maintain, the survey is faulty, then substantial debris still needs to be removed, after the survey is property reconfigured." The court

---

[8]    The trial court referenced CACI No. 203, which provides: "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."

observed: "Since the court has determined Plaintiff VARTANIAN has NOT established the Jones & Snyder survey was 'faulty,' inferentially then, there would *not* still be 'substantial debris' to be removed." (Italics added.)

The trial court continued: "Not to be deterred, at the hearing M[s]. VARTANIAN argued an additional reason for the survey to be rejected – that there were not stakes placed every 20 feet. Ms. VARTANIAN testified there was an 'understanding' at the mediation the stakes would be placed every 20 feet and according to her observations[,] they were not." The court indicated Vartanian used this theory as justification for rejecting the survey commissioned by Swalef.

In analyzing Vartanian's claims, the court cited *Masterson v. Sine* (1968) 68 Cal.2d 222 (*Masterson*), which provides: "When the parties to a written contract have agreed to it as an 'integration' -- a complete and final embodiment of the terms of an agreement -- parol evidence cannot be used to add to or vary its terms." (*Id.* at p. 225.) As noted by the court, *Masterson* further provides: " 'If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.' " (*Id*. at p. 228.)

The trial court observed that paragraph 14 of the Settlement Agreement provided: "This agreement contains the entire agreement between the parties hereto and the terms of [t]his settlement … are contractual. The terms of this agreement may not be enlarged, diminished or modified in any degree, except by a writing specifically referring to this agreement and signed by the party against whom the modification is sought to be enforced." The court stated: "The plain meaning of this language is the terms of the deal may not be 'enlarged, diminished or modified in any degree, except by a writing…'"

The trial court further analyzed: "To this court, inserting an obligation on Defendant SWALEF to insure Jones & Snyder [was required] to place stakes 20 feet

27.

apart is certainly both an enlargement and a modification of the obligations of Defendant SWALEF and therefore of the terms of the agreement.  Also, under *Masterson*, this court finds if in fact both sides agreed to add this term to the agreement, they certainly would have put it in the written document."  (Fn. omitted.)

The trial court concluded (as to paragraph 1 of the Settlement Agreement):  "In summary, the court declines to add the 20 foot spacing requirement for the survey stakes into the integrated Settlement Agreement.  Accordingly, any concerns by Ms. VARTANIAN that the staking did not meet her approval, as a basis for rejection of Defendant SWALEF's obligations under paragraph one of the Settlement Agreement, is rejected.  Defendant has satisfied paragraph one of the Settlement Agreement."  (Fn. omitted.)

*Trial Court's Analysis as to Paragraph 2 of the Settlement Agreement*
*(Removal of Encroaching Debris)*

The trial court next addressed paragraph 2 of the Settlement Agreement.  The court stated:  "Paragraph 2 of the Settlement Agreement … requires Defendant SWALEF to remove, at his sole expense, all of the encroaching debris to the written satisfaction of Plaintiff VARTANIAN.  [¶]  Who would have thought that so few words could produce such contention?"  (Fn. omitted.)  The trial court noted that although Vartanian stated in her rejection letter to Swalef that she was rejecting his performance because the survey was faulty (so if the survey was not faulty, the debris removal was satisfactory), she later "pivoted" to her present position that regardless of the survey, Swalef had failed to remove the debris to her "written satisfaction."

The trial court noted:  "At the hearing, the parties could not agree on what remov[ing] all encroaching debris meant or the breadth of the words 'written satisfaction.'"  The court explained that it had earlier issued an order "address[ing] the standard by which Ms. VARTANIAN's 'written satisfaction' [was] to be measured."

28.

The court applied *Kadner v. Shields* (1971) 20 Cal.App.3d 251, 259, 262–263, to conclude that the "reasonable man" standard was the appropriate standard.[9]

The trial court analyzed the record: "As a bit of background it appears undisputed for the purpose of this motion that Defendant SWALEF had various shrubs, mostly bottlebrush, which hung over his property line and on to the property of Plaintiff VARTANIAN — hence the provision in the Settlement Agreement to remove the 'encroaching debris.'" The court continued: "Defendant SWALEF testified he had the landscaping on his property cut back. SWALEF said this occurred over a period of three days starting September 21, 2020." The court added: "Mr. Zuniga said he was engaged by Defendant SWALEF to cut down branches and gather trash on his property so 'none of it extended to the other side.'" The court further noted: "Mr. Zuniga testified Exh. 'O' (photo) is a photo he believes he took on the 25th or 26th. He said the photo accurately reflects what the property looked like after he cleaned it up. He cut based on the line (string) [visible in the photo]. He sent this photo to Mr. Swalef to make sure his work was done properly." The court reproduced Exhibit O in its order. The court concluded: "Based on Mr. Zuniga's testimony and this photo, it looks to the court like the 'encroaching debris' have been removed." (See Appendix A, *post.*)

The trial court pointed out that Vartanian specifically testified with reference to Exhibit O. The court stated that Vartanian "said in looking at Exhibit 'O' [that] she could see 'heavy encroachments [of bottlebrush bushes] that is about 120 feet long'" and "'covered the entire property line and was all over both sides of the property line.'" The court observed: "No matter how one looks at Exhibit 'O,' there is no way to see 'heavy encroachments 120 feet long' or bottlebrush bushes 'all over' on both sides of the property line. This is simply a fabrication." The court concluded: "Under no

---

[9]     On appeal, both parties agree that the trial court correctly applied the reasonable person standard.

29.

circumstances can Ms. VARTANIAN, in application of the 'reasonable man' standard, appropriately withhold her 'written satisfaction' of Defendant's performance under paragraph 2 of the agreement."

The trial court addressed one last argument propounded by Vartanian, namely that she was justified in rejecting Swalef's performance under the settlement agreement because he failed to sufficiently cut back the bottlebrush bushes for her to install a boundary fence. Specifically, the court stated: "Finally, Plaintiff VARTANIAN contends she has a right to reject Defendant SWALEF's performance in removing the 'encroaching debris' because it does not allow her room to install a fence at the property line…. Plaintiff argued because she did not have access to both properties to permit her fencing contractor to put up a fence, she had a right to reject Defendant's performance."

The trial court analyzed: "While the Settlement Agreement contemplates Plaintiff will be constructing a fence (paragraph 5)[,] there is nothing in the agreement requiring Defendant to clear the 'encroaching debris' to a point beyond the property line. One, vegetation would not be 'encroaching' if it did not extend over the property line. Two, the court sees this analysis as identical to Plaintiff's 'requirement' that the stakes be every 20 feet (above). The court declines to add this requirement (to remove the vegetation beyond 'encroaching' to some undefined point on Defendant's property to permit Plaintiff's fencing contractors access)." The court added: "To be clear, this is an integrated agreement. Ms. VARTANIAN's additional requirement to cut back vegetation to a point beyond 'encroaching' would 1) 'enlarge' and 'modify' the terms of the Settlement Agreement (see paragraph 14) and 2) if it was as important as Ms. VARTANIAN and her counsel suggest it to be, specific language would most certainly have been added by them to the Settlement Agreement before signing to address this concern. See *Masterson*, *supra*, at 229."

30.

*Trial Court's Conclusion*

The trial court concluded: "It is clear to the court that Defendant SWALEF has carried his burden of proof and demonstrated by (more than) a preponderance of the evidence that he [h]as satisfied his obligations under the Settlement Agreement." The court added: "Paragraph 7 of the Settlement Agreement provides[,] 'Upon successful completion of the removal of the vegetation and debris, Plaintiff will prepare and execute a dismissal with prejudice and will file the same with the Madera County Superior Court.' [¶] The court having found Defendant to have performed under the Settlement Agreement, Defendant's motion is granted, and Plaintiff's Complaint is dismissed, with prejudice."

## DISCUSSION

I. JONES SNYDER & ASSOCIATES STAKED THE PROPERTY LINE IN SEPTEMBER 2020

### A. *Vartanian's Argument*

Paragraph 1 of the parties' settlement agreement provides, in part: "It is agreed that BRANDON SWALEF … shall pay for Jones[, Snyder] & Associates to survey and to stake the property line between [the Swalef and Vartanian properties]." Vartanian now argues: "[A]lthough it was Swalef's burden to demonstrate that Vartanian had breached the settlement agreement, Swalef himself breached the agreement by failing to hire a surveyor "to survey and to stake the property line between them." (Boldface omitted.)

Vartanian acknowledges that Swalef hired Jones Snyder & Associates to survey the property line. However, Vartanian adds that *documents* related to Jones Snyder & Associates' work for Swalef do not definitively show that the property was staked. For example, Vartanian states that the proposal for the work that Jones Snyder & Associates e-mailed to Swalef presented two options. For $1,200 the firm would (1) "Find, flag, and verify or reset all property corners"; (2) "Set intermediate points on property lines where

31.

accessible"; and (3) "Provide a Map of Survey showing all corners/line points, house, and property lines superimposed on a color aerial photo." Alternatively, for $800, the firm would "Stake the North Line ONLY." She further contends: "Shortly after the surveyor firm completed their work, they billed Swalef, providing him with an invoice, marked 'paid,' which described an $800 charge to 'Find, flag, and verify property corners and [p]rovide a Map of Survey.'" Vartanian notes: "That invoice … did not mention staking the property line."

Among other things, Vartanian suggests that these documents (the proposals, invoice, and related paperwork) create an ambiguity as to whether the work performed included staking the property line. She notes that Swalef paid $800 per the invoice, but the services rendered appear to be those set forth in the $1,200 proposal (which did not include staking).

Vartanian speculates as to why the paperwork reflects a discrepancy between the work performed as reflected in the invoice and the amount paid by Swalef. Ultimately, she posits: "In sum, although the documentation of the agreement between Jones Snyder and Swalef is ambiguous, under any reasonable interpretation of the documents and the testimony of Swalef, Vanlandingham and Vartanian, no staking was contracted for and no staking was performed." Vartanian adds: "It is clear from the evidence adduced at trial that Swalef materially breached the agreement with Vartanian by failing to hire the surveyor to stake the property; he hired the surveyor firm only to survey it. And, when the surveyor provided him with the final invoice it omitted any mention of staking (or even [of] setting 'intermediate points on property lines where accessible')."

Vartanian continues: "Under California law and the undisputed facts, Swalef's refusal to have the boundary line staked constituted a material breach of contract. Therefore, he was not entitled to seek enforcement of the mediation agreement. The trial court's decision to grant Swalef's motion and dismiss Vartanian's complaint was

erroneous. The trial court's decisions should be reversed and this matter remanded for further proceedings."

As discussed below, we are not persuaded by Vartanian's arguments.

B. *Analysis*

As an initial matter, Vartanian's reliance on documents such as proposals and an invoice as a definitive measure of the work performed is puzzling, especially when there was ample testimony and photographic evidence establishing that Jones Snyder & Associates staked the disputed property line in September 2020. Indeed, Vartanian herself testified to the presence of stakes along the property line and discussed exhibits showing stakes on the property line.

Here, Vanlandingham, the owner of Jones Snyder & Associates and an experienced, licensed surveyor, testified to these issues. Vanlandingham acknowledged that the invoice sent to Swalef after completion of the work did not specify that the north line of Swalef's property was staked. However, critically, Vanlandingham explained: "I think the invoice is not intended to be a comprehensive report of what we did. It's an invoice."

In addition, Vanlandingham was specifically asked: "[W]hen you checked the property after your employees had completed their work, did you notice if any stakes had been placed?" He answered in the affirmative and further noted that he noticed multiple stakes on the property that were "consistent with what our company uses," that is, stakes with red, yellow, and/or pink ribbons.

Finally, Vanlandingham further clarified that the Jones Snyder & Associates' 2020 survey map depicting the property line also reflects that corners and intermediate points were physically marked on the property. Specifically, he said the map showed the property line was marked by four intermediate stakes (single color ribbons) and two end point stakes (double color ribbons), for a total of six stakes. (See Appendix C, *post.*)

33.

Next, Swalef's testimony supports the conclusion that Jones Snyder & Associates staked the disputed property line in September 2020. Swalef went to his property when Jones Snyder & Associates' staff members were conducting the field survey. Swalef testified that two staff members were present; he clarified that "one was there … to operate the equipment, and the other person was there to stake the line." Swalef further indicated he saw the stakes Jones Snyder & Associates placed along the property line as part of their surveying work. Although he noted he could not "give an exact number" for the number of stakes he had seen, when pressed he responded, "[p]robably around eight." As described in the summary of Swalef's testimony above, he also discussed various photographs taken in September – October 2020 and December 2020 – January 2021, that showed stakes placed along the property line. Swalef confirmed that all the stakes placed along the property line in September 2020 were installed by Jones Snyder & Associates at his request.

As for Vartanian, she testified that she checked Swalef's property after the fieldwork for the 2020 survey was completed and saw four stakes placed on the property line by Jones Snyder & Associates' staff. All four stakes had red and yellow ribbons attached. Shortly thereafter, in the first week of October, additional stakes materialized on the property line; the new stakes had pink ribbons attached. The new stakes were placed "[a]round the encroachment[s]" spilling onto her property.

The trial court specifically found that Jones Snyder & Associates surveyed and staked the property in September 2020, at Swalef's request. The court stated in its written ruling: "*From the undersigned's perspective, Mr. VanLandingham was a credible witness who explained his firm surveyed the property line and staked it.* Mr. VanLandingham has been a licensed land surveyor since 2007…. [Vartanian's counsel] stipulated Mr. VanLandingham was an expert, 'regarding the boundary lines of those two lots. [Citations.] Mr. VanLandingham's staff prepared a map of survey in September

34.

2020." (Italics added.) The court included pertinent excerpts of Vanlaningham's testimony and related exhibits in its ruling.

The trial court further noted: "To the court, Defendant SWALEF, through Mr. VanLandingham, has by more than a preponderance of the evidence, established *Jones & Snyder did survey the boundary and did stake the property line between the two properties* (Defendant SWALEF's obligation under paragraph one of the Settlement Agreement). Mr. VanLandingham's testimony also rebutted Ms. VARTANIAN's claim the survey was 'faulty' because her property is a 'rectangle' and she was short[ed] 'as much as five feet[.]' … Mr. VanLandingham explained … the property is not rectangular, and rather than being 'short[ed],' 'everybody gets a little bit more land.'" (Italics added.)

The trial court's determination that Jones Snyder & Associates staked the disputed property line in September 2020 is amply supported by substantial evidence. Accordingly, Vartanian's claim that Swalef breached the settlement agreement because the property line was only surveyed and not staked, is unavailing.

II. SWALEF DID NOT IMPROPERLY PREVENT THE DISCLOSURE OF JONES SNYDER & ASSOCIATES' ADMINISTRATIVE DOCUMENTS

A. *Vartanian's Argument*

After Vanlandingham testified as an expert witness on Swalef's behalf, Vartanian subpoenaed him to testify as a percipient witness. Vartanian's subpoena directed Vanlandingham to produce his company's file for Swalef's job. Swalef's counsel filed a motion to quash and sent an e-mail to Vanlandingham as follows: "I am sending this to let you know that [a motion to quash] has been filed … you do not need to attend [the court proceeding]. Once the [motion to quash] hearing is held … I will let you know if/when your attendance is required." (Boldface omitted.)

35.

Vartanian argues that Swalef's counsel's actions were an attempt to block Vartanian from accessing Vanlandingham's file. Vartanian contends that Swalef's counsel acted this way because the documents in Vanlandingham's file (proposals, invoice, etc.), "constitute the 'smoking gun' that demonstrate beyond doubt that Swalef failed to engage Jones Snyder 'to survey and to stake' the property line." Vartanian asserts that the allegedly obstructive conduct of Swalef's attorney amounted to misconduct and was "clear evidence of 'a guilty conscience.'"

Vartanian has not supported her assertions and arguments with appropriate citations to the record and to relevant legal authorities. In any event, Vartanian's arguments lack merit.

B. *Analysis*

As noted, Vartanian has not provided citations to the record for this court to ascertain the facts pertinent to her argument. This court has attempted to find the pertinent facts in the record but only some of the relevant facts are reflected in the record. It appears that Vartanian subpoenaed Vanlandingham to appear to testify in the instant proceedings on September 16, 2022, and to bring with him his company's file for Swalef's job. However, neither Vartanian nor her counsel were in court on September 16, 2022 (both apparently had COVID symptoms or exposure). Swalef's counsel was present in court and informed the court that she had filed a motion to quash the subpoena served on Vanlandingham. Vanlandingham was not in court. The court set the hearing in the matter over to October 12, 2022, when Swalef's motion to quash subpoena was also set for hearing.

On October 12, 2022, the trial court addressed Swalef's motion to quash. Swalef's counsel stated: "My issue is twofold. One, the timeliness of the subpoena itself and the way it was served, and the document request." The court asked Vartanian's counsel whether Vanlandingham was served because the court did not have any proof of service.

36.

Vartanian's counsel responded that "[Vanlandingham] was served back before the last hearing," that is, the September 16, 2022 hearing. Counsel added that because counsel was sick that day, his office called Vanlandingham and told him not to come. Counsel added that Vanlandingham was subsequently served with another subpoena; counsel handed the proof of service for the second subpoena to the court. The court stated: "The proof of service indicates that Mr. [V]anlandingham was served on Monday of this week. Today is Wednesday -- at 6:30 p.m. with a civil subpoena duces tecum for personal appearance and production of documents, electronically stored information…."

The trial court addressed Code of Civil Procedure section 1987.1 and Swalef's attorney noted that both subpoenas served by Vartanian on Vanlandingham were untimely under Code of Civil Procedure section 1987, subdivisions (b) and (c). Swalef's attorney noted: "There is a 20-day [notice] period [when documents are requested], and [Vartanian's counsel] has now done it twice. First subpoena was September 12th for a September 16th hearing, even though [counsel] had knowledge of that date back in July. The second service date was October 10th for today's hearing. Again, not timely. And you know, [counsel] had every opportunity to do it in a timely manner and has chosen not to." The court acknowledged that under Code of Civil Procedure section 1987, subdivision (c), if applicable, the subpoenas were untimely. However, the court exercised its discretion and excused the untimeliness and denied Swalef's motion to quash.

Swalef's counsel also informed the court that Vanlandingham had sent an e-mail to both counsel on October 11, 2022, informing them he was not available on October 12, 2022. However, when the hearing resumed on December 12, 2022, Vanlandingham *was present and produced his entire file for the Swalef job.* Vartanian's counsel was able to question him about the documents in the file.

Vartanian has not established that the subpoenas served on Vanlandingham were timely. In turn, Vartanian has not established that Swalef's counsel was remiss in filing the motion to quash. As for Vartanian's complaint that Swalef's counsel was remiss in telling Vanlandingham he need not come to court until the court ruled on Swalef's motion to quash, the trial court dismissed that allegation. The court stated: "[O]nce there's a motion to quash filed, the Court's not gonna look at the [subpoenaed] documents until I decide what to do with the motion to quash, so it's a no-harm-no-foul [situation]." Vartanian has not shown any error in the court's resolution of these issues.

III. TRIAL COURT PROPERLY FOUND THAT VARTANIAN'S REJECTION OF SWALEF'S PERFORMANCE UNDER THE SETTLEMENT AGREEMENT WAS UNREASONABLE

As noted above, the trial court determined: "Defendant SWALEF, through Mr. VanLandingham, has by more than a preponderance of the evidence, established Jones & Snyder did survey the boundary and did stake the property line between the two properties (Defendant SWALEF's obligation under paragraph one (surveying and staking) of the Settlement Agreement)." The court further concluded: "[T]he court declines to add the 20 foot spacing requirement for the survey stakes into the integrated Settlement Agreement. Accordingly, any concerns by Ms. VARTANIAN that the staking did not meet her approval, as a basis for rejection of Defendant SWALEF's obligations under paragraph one of the Settlement Agreement, is rejected."

The trial court also addressed paragraph 2 of the settlement agreement (removal of encroaching debris to Vartanian's written satisfaction). The court clarified that the issue of Vartanian's "ultimate rejection of Defendant SWALEF's efforts to remove the 'encroaching debris' to her 'written satisfaction,' is to be determined by the 'reasonable man' standard." The court found, based on the testimony of Benjamin Zuniga and Exhibit O (see Appendix A, *post*), that "the 'encroaching debris' [had] been removed." The court concluded: "Under no circumstances can Ms. VARTANIAN, in application of

the 'reasonable man' standard, appropriately withhold her 'written satisfaction' of Defendant's performance." The court rejected Vartanian's belated theory that she properly rejected Swalef's performance because, in cutting back the vegetation from the boundary, Swalef did not create enough clearance for Vartanian to install a fence on the property line.

Vartanian now argues: "Vartanian's approach and her rejection were founded on the basis of reasonableness. While someone else might have made a different reasonable decision at that time, we don't see how. In any event, her decision was reasonable and should be enforced."

We are not persuaded by Vartanian's argument. The trial court's factual findings were amply supported by substantial evidence. Nor has Vartanian shown legal error on the part of the court. Accordingly, we affirm the court's determinations. To the extent the court applied the parol evidence rule in reaching its conclusions, that issue is addressed below.

## IV. TRIAL COURT PROPERLY APPLIED THE PAROL EVIDENCE RULE

Vartanian argues the trial court misapplied the parol evidence rule in reaching its conclusions. We disagree.

The parol evidence rule is codified in Code of Civil Procedure section 1856 and Civil Code section 1625. Code of Civil Procedure section 1856, subdivision (a) provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." Code of Civil Procedure section 1856, subdivision (b) provides: "The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement." Civil Code section 1625 provides: "The execution of a contract

in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

### A. *Alleged Oral Agreement to Stake Boundary Line Every 20 Feet*

In this matter, the parol evidence rule was implicated because Vartanian indicated she and Swalef had struck an oral agreement at the mediation to the effect that Swalef would have Jones Snyder & Associates stake their common boundary line every 20 feet. However, there was no mention of a 20-foot staking requirement in the final, written settlement agreement, which was reached with both parties represented by counsel. The relevant provision of the settlement agreement, namely paragraph one, provides, in relevant part: "It is agreed that BRANDON SWALEF … shall pay for Jones & Snyder & Associates to survey and to stake the property line between them." Further, the settlement agreement contained, in paragraph 14, an integration provision. The trial court ruled that, under the circumstances, extrinsic evidence of an oral agreement was inadmissible under the parol evidence rule for purposes of interpreting the written settlement agreement. Vartanian challenges the court's determination on this point. We agree with the court.

In its ruling, the trial court explained: "While [Vartanian's counsel] agreed the Settlement Agreement did not contain the '20 foot' requirement, he argued evidence of an agreement at the mediation prior to the execution of the Settlement Agreement should be admissible as parol evidence under [*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 (*Thomas*)]." (Fn. omitted.) The court quoted the following passage from *Thomas*, as brought up by Vartanian's counsel: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered

40.

evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Id*. at p. 37.)

The court quoted another passage from *Thomas*, relied on by Vartanian's counsel: "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding." (*Thomas, supra,* 69 Cal.2d at p. 39.)

The trial court further noted: "In another California Supreme Court decision of the same year, the Supreme Court offered further guidance on admissibility of parol evidence when addressing integrated agreements: [¶] 'When the parties to a written contract have agreed to it as an 'integration' -- a complete and final embodiment of the terms of an agreement -- parol evidence cannot be used to add to or vary its terms. ([*Masterson*, *supra*, 68 Cal.2d at p. 226].)" The court observed that *Masterson* also provided: " 'If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.' " (*Id.* at p. 228.)

Having distilled applicable caselaw, the trial court cited paragraph 14 of the parties' settlement agreement, which constitutes an integration provision: "14. This agreement contains the entire agreement between the parties hereto and the terms of [t]his settlement and release are contractual. The terms of this agreement may not be enlarged, diminished or modified in any degree, except by a writing specifically referring to this

agreement and signed by the party against whom the modification is sought to be enforced."

The court concluded: "To this court, inserting an obligation on Defendant SWALEF to insure Jones & Snyder adds a provision requiring them to place stakes 20 feet apart is certainly both an enlargement and a modification of the obligations of Defendant SWALEF and therefore of the terms of this agreement." The court added: "Also, under *Masterson*, this court finds if in fact both sides agreed to add this term to the agreement, they certainly would have put it in the written document." The court therefore declined to consider extrinsic evidence regarding a putative oral agreement adopting a 20-foot staking requirement.

The trial court's analysis was appropriate, and we see no reason to disturb the court's resolution of the issue. Paragraph 14 of the agreement is an integration provision. Next, under paragraph 1, Swalef was required to retain a specific, professional surveying company, Jones Snyder & Associates, to survey and stake the common boundary line. It follows that the surveying and staking was to be done according to the professional standards of the agreed-upon firm. Requiring Swalef to order the designated professional firm to stake the boundary in a very specific way (i.e., to place stakes every 20 feet) is *inconsistent* with the explicit language of paragraph 1, which directs Swalef to relegate the surveying and staking to a professional firm. In other words, Swalef was required to turn over the surveying and staking to a neutral, professional firm. Modifying paragraph 1 to require Swalef to exert personal control over the surveying and staking process is inconsistent with, or contradicts, the terms of the agreement. Accordingly, extrinsic evidence of any oral agreement to stake the common boundary every 20 feet is inadmissible under Code of Civil Procedure section 1856, subdivisions (a) and (b) for purposes of interpreting the parties' integrated, written settlement agreement.

42.

The trial court's exclusion of extrinsic evidence for purposes of interpreting the parties' integrated settlement agreement is further supported by other authorities. (See *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1513 [where settlement agreement between insurer and insured was integrated as to insurer's obligation to assist insured in his litigation against others, alleged oral 'side agreement' addressing same subject was not admissible, regardless of whether side agreement was consistent or inconsistent with settlement agreement]; *Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1175 [trial referee improperly admitted extrinsic evidence to interpret contract containing integration clause allowing "no extrinsic evidence whatsoever," where exclusion of extrinsic evidence did not implicate public policy, and both parties were represented by counsel in negotiating contract].)

Furthermore, here there was a clear conflict in the evidence as to the existence of any contemporaneous oral agreement regarding stake placement. While Vartanian indicated an oral agreement existed, Swalef denied there was any such agreement.[10] At the same time, the trial court found that Vartanian was not a credible witness, while Swalef was a credible witness. Under these circumstances, it would appear Vartanian had a subjective intention for the boundary line to be staked every 20 feet. However, evidence of intention that is contrary to the specific terms of an integrated agreement is inadmissible for purposes of interpreting the latter. (See, e.g., 2 Witkin, Cal. Evid, 6th Docu. Evid., § 80 (2025) ["There is a fundamental limitation on the admissibility of evidence to interpret a writing. Once it is accepted as a final expression of a contract or a will, any declarations or testimony of intention contrary to its express terms do not give it meaning but substitute a different meaning and they are consequently excluded."].)

---

[10] Vartanian insists that "Swalef also testified that the parties agreed at mediation that [he] would have the surveyor place stakes every twenty feet." However, Swalef repudiated the testimony at issue and clarified that Vartanian's counsel had misunderstood it. Swalef further clarified that no such oral agreement was ever made.

We affirm the trial court's exclusion of evidence concerning any contemporaneous oral agreement to install stakes on the common boundary every 20 feet, with regard to interpreting the parties' written settlement agreement.

B. *Vartanian's Fence-Related Justification for Rejecting Swalef's Performance*

The trial court also addressed Vartanian's contention that "she has a right to reject Defendant SWALEF's performance in removing the 'encroaching debris' because it does not allow her room to install a fence at the property line." The court noted: "[Vartanian] argued because she did not have access to both properties to permit her fencing contractor to put up a fence, she had a right to reject [Swalef's] performance." The court explained: "While the Settlement Agreement contemplates Plaintiff will be constructing a fence (paragraph 5)[,] there is nothing in the agreement requiring [Swalef] to clear the 'encroaching debris' to a point beyond the property line." The court analyzed: "One, vegetation would not be 'encroaching' if it did not extend over the property line. Two, the court sees this analysis as identical to Plaintiff's 'requirement' that the stakes be every 20 feet."

The court stated: "The court declines to add this requirement (to remove the vegetation beyond 'encroaching' to some undefined point on [Swalef's] property to permit [Vartanian's] fencing contractors access)." The court ruled: "To be clear, this is an integrated agreement. Ms. VARTANIAN's additional requirement to cut back vegetation to a point beyond 'encroaching' would 1) 'enlarge' and 'modify' the terms of the Settlement Agreement (see paragraph 14) and 2) if it was as important as Ms. VARTANIAN and her counsel suggest it to be, specific language would most certainly have been added by them to the Settlement Agreement before signing to address this concern. [(]See *Masterson*, [*supra*], at [p.] 229.[)]"

The trial court properly disregarded Vartanian's testimony and related contentions regarding her alleged understanding that, under the settlement agreement, Swalef would

44.

cut back the encroaching vegetation to an undefined point on his side of the property line, to enable her to install a fence on the property line. (See *Sunniland Fruit, Inc. v. Verni* (1991) 233 Cal.App.3d 892, 898 [grower's testimony that he understood that crop advance was payment from corporation under contract to pick, pack, and market grapes, rather than loan as stated in the agreement, was inadmissible statement of grower's subjective intent]; *Salehi v. Surfside III Condominium Owners Assn.* (2011) 200 Cal.App.4th 1146, 1159 [evidence of undisclosed subjective intent of parties is irrelevant in determining meaning of contractual language].)

V.     TRIAL COURT PROPERLY EXCLUDED VARTANIAN'S WITNESSES: VIZEROS AND CHAPA

Vartanian argues the trial court improperly excluded two witnesses she wanted to call, namely Isaac Vizeros and Victor Chapa, two fencing contractors she consulted about putting a fence on the common boundary. Vartanian contends:

> "Vartanian repeatedly attempted to proffer evidence from the two men [Issac Vizeros and Victor Chapa, whom] she asked to inspect her property after Swalef said he had removed the encroachments. These men were qualified as fencing contractors, having built fences for many years. A stated purpose for the settlement agreement was so Vartanian could install a fence at the boundary. Their input was important to her. And, besides herself, they were percipient witnesses as to the status of the encroachment removal. Each would have testified as to the difficulty of getting near the boundary because the encroachments were so thick and extensive along the southern side of Vartanian's property; also, they would have testified that it was impossible to get a fence at or near the property line."

Vartanian adds: "[The] testimony [of Vizeros and Chapa] was absolutely crucial to Vartanian's case, especially since the judge specifically attacked her personal credibility. The testimony of Vizeros and Chapa [was] an essential underpinning of Vartanian's assertion that her dissatisfaction with Swalef's performance was reasonable. Yet, the trial court excluded that evidence."

45.

We find no abuse of discretion in the trial court's exclusion of Vizeros and Chapa. Vizeros and Chapa were fence installers who came to Vartanian's property to provide her with an estimate for installing a fence on the common boundary. Vizeros and Chapa were not parties to the settlement agreement and had no knowledge or understanding of the requirements of the settlement agreement. They were not licensed surveyors and had no independent knowledge of the true boundaries of Vartanian's lot or the location of the property line between the two properties. The primary point of their respective testimony apparently was that it was not possible to install a fence on the property line because of insufficient clearance on Swalef's side of the property line. However, as discussed above, the trial court properly determined that, under the settlement agreement, Swalef was not required to create an undefined measure of clearance for purposes of Vartanian's fence installation. Accordingly, the court did not abuse its discretion in excluding these witnesses.

Vartanian further contends that Vizeros would have testified that when he came to Vartanian's property, he observed "a hodgepodge of survey stakes" and "determined that the stakes were placed several feet within Vartanian's property and not near the property line." However, Vizeros was not a licensed surveyor, and any weight accorded to such testimony would have been minimal. Thus, the court's exclusion of Vizeros was not an abuse of discretion.

Vartanian also complains that Vizeros and Chapa would have testified that the property line was marked by encroaching roots. Again, Vizeros and Chapa were not competent to testify to the location of the property line. Moreover, Vartanian has not established that the settlement agreement encompassed removal of encroaching roots or roots proliferating underground. The trial court's exclusion of these witnesses was therefore not an abuse of discretion.

46.

Vartanian suggests the trial court further erred in excluding the testimony of John Pape, an arborist, and James Tuck, who had leased Vartanian's lot in 2019. As to Pape, Vartanian's brief merely states: "Mr. Pape was a licensed arborist who was offered to testify as to the infestation of roots, because the court had rejected anybody but an arborist to testify about that." As to Tuck, Vartanian's brief simply states: "Mr. Tuck was also offered as a witness because of Ms. Vartanian's testimony about him." To the extent Vartanian is challenging the court's exclusion of these witnesses, her argument is not sufficiently developed to enable evaluation of its merits.

## VI.  VARTANIAN'S CREDIBILITY

Finally, Vartanian takes issue with the trial court's assessment of her credibility. Vartanian states: "We respectfully assert Ms. Vartanian's testimony was based on facts and on her correct recollections that were actually substantiated by the adversary's testimony. Vartanian is stuck with the consequences of the trial court's effort to buttress its decision against appellate review. But the issue of Vartanian's credibility does not preclude reversal because the records demonstrate the trial court misconstrued Vartanian's testimony and because the trial court committed prejudicial legal errors."

"Conflicts in the evidence, conflicting interpretations thereof and conflicting inferences which reasonably may be drawn therefrom present issues of fact for determination by the trier of fact, who 'is the sole judge of the credibility of the witnesses'; may 'disbelieve them even though they are uncontradicted if there is any rational ground for doing so'; and, in the exercise of a sound legal discretion, may draw or may refuse to draw inferences reasonably deducible from the evidence." (*Coutts v. Grant* (1960) 184 Cal.App.2d 255, 257.) We will not disturb the trial court's credibility determinations.

**DISPOSITION**

The judgment is affirmed. Swalef is entitled to his costs on appeal.

FRANSON, J.

WE CONCUR:

DETJEN, Acting P. J.

PEÑA, J.

48.

**APPENDIX A**





50.

**APPENDIX C**



51.